FILED & ENTERED

NOV 01 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| In re<br>**Private Asset Group, Inc.**<br>Debtor(s). | Case No.: 8:11-bk-18693-MW<br>CHAPTER 7<br>**MEMORANDUM DECISION AND ORDER ON CHAPTER 7 TRUSTEE'S MOTION FOR ORDER: (1) DECLARING THAT THE ATTORNEY CONTINGENCY FEE PAYABLE IS LIMITED TO FORTY (40) PERCENT; (2) RECONSIDERING THE ORDER APPROVING THE FEE APPLICATION OF THE MONSON FIRM; (3) REQUIRING DISGORGEMENT OF EXCESS FEES RECEIVED BY THE MONSON FIRM; AND (4) APPLYING OF THE ADVERSARY RULES OF PROCEDURE RULE 7001 ET SEQ**<br>Hearing:<br>Date:    October 4, 2017<br>Time:    9:00 a.m.<br>Courtroom: 6C |

This matter comes before the Court on the Chapter 7 Trustee's Motion for Order: (1) Declaring That the Attorney Contingency Fee Payable Is Limited to Forty (40) Percent; (2) Reconsidering the Order Approving the Fee Application of the Monson Firm; (3) Requiring Disgorgement of Excess Fees Received By the Monson Firm; and

1

(4) Applying of the Adversary Procedure Rule § 7001 Et Seq. (as supplemented, the "Motion").

## FACTUAL BACKGROUND

Private Asset Group, Inc. and thirteen other plaintiffs retained the law firm of Zampi, Determan & Erickson, LLP (the "Zampi Firm") in December 2010 to jointly represent them in a state court action against the accounting firm of Mayer Hoffman McCann ("Mayer Hoffman"). The complaint alleged that Mayer Hoffman had performed accounting services for an entity later determined to have been operating a Ponzi scheme and, in that connection, had made various material accounting misrepresentations.

Private Asset Group, Inc. filed a voluntary petition under Chapter 7 on June 20, 2011, commencing this case. The Zampi Firm's fee arrangement with Private Asset Group, Inc. and the other plaintiffs was a part fixed hourly fee (payable monthly up to a cap), part contingency fee arrangement.[1] Charles Daff, chapter 7 trustee for Private Asset Group, Inc. (individually and/or in his capacity as chapter 7 trustee, "Mr. Daff"), determined that an hourly fee, even with the monthly cap, was not something he wanted to agree to on the bankruptcy estate's behalf and therefore commenced a search for an attorney or law firm who would be willing to represent the estate on a pure contingency fee basis. After several law firms turned the engagement down, the Law Office of Kevin E. Monson (the "Monson Firm"), headed by Kevin Monson, Esq. ("Mr. Monson"), agreed to the engagement in exchange for a 33 percent contingency fee that would escalate to 40 percent if there was an appeal (plus costs). An employment application for this purpose was filed by Mr. Daff on September 27, 2011 (the "First Employment Application") and was approved by the Court by order entered December 1, 2011.

The Zampi Firm filed a proof of claim in the Private Asset Group, Inc. case on December 22, 2011 (the "Original Zampi POC"), asserting a prepetition general unsecured claim for attorney's fees in an "unknown amount." Mr. Daff and Mr. Monson discussed this claim, and Mr. Daff told Mr. Monson not to worry about it because it was

---

[1] 3 Reporter's Transcript ("R.T.") at 18-20. The "3" in the citation indicates that this is the third day of the evidentiary hearing, namely, October 6, 2017. "2" indicates the second day of the hearing, namely, October 5, 2017, and "1" the first day of the hearing, namely, October 4, 2017.

merely a prepetition general unsecured claim that would be junior to administrative expenses.[2]

Notwithstanding the filing of the Original Zampi POC, Mr. Daff explored the possibility of engaging the Zampi Firm as special counsel in the state court litigation. On January 12, 2012, he filed an application to modify the terms of employment of Mr. Monson (the "Second Employment Application") wherein Mr. Monson's contingency fee would drop to 15 percent, with the Zampi Firm acting as lead counsel and receiving a 25 percent contingency fee.  The Zampi Firm was unable to obtain the informed consent of the other plaintiffs in the action against Mayer Hoffman, resulting in a foundering of Mr. Daff's efforts to obtain the Zampi Firm's assistance in the action.  Presumably for this reason Mr. Daff chose not to seek the Court's approval of the Second Employment Application.

Mr. Daff and Mr. Monson were friends on a professional, although not on a personal, level.[3]  They had known each other for over 20 years.  In his capacity as a trustee, Mr. Daff had employed Mr. Monson four times over the years.  In October 2012, Mr. Daff in his personal capacity (i.e., not in the capacity of a chapter 7 trustee or for or on behalf of any bankruptcy estate) borrowed $23,000 from Mr. Monson.  Mr. Daff had encountered personal financial difficulties and was short of funds that he needed to pay his tax obligations.[4]  The loan was not evidenced by a promissory note or by anything in writing other than Mr. Monson's check to Mr. Daff.  No interest was charged on the loan. The loan was repaid in full by Mr. Daff in April 2013.[5]  The loan was never disclosed to the Court or to the other parties in the case until approximately October 2016, as discussed below.

About 17 months after the first loan had been repaid in full, in September 2014, Mr. Daff borrowed $10,000 from Mr. Monson in a second loan transaction.  Like the first loan, no interest was charged and the only written evidence of the loan was Mr. Monson's check to Mr. Daff.  Mr. Daff needed these funds for general business and

---

[2] 1 R.T. at 44-45.
[3] 1 R.T. at 53-54.
[4] 2 R.T. at 83, line 22.
[5] 1 R.T. at 50, lines 2-3.

3

personal expenses.[6] The second loan was repaid in full in May 2015.[7] This second loan was never disclosed to the Court or to the other parties in the case until October 2016, as discussed below.  2 R.T. at 80-81.

In the meantime, the case against Mayer Hoffman was proceeding at full speed. The Mayer Hoffman litigation was no small matter from the perspective of the Monson Firm.  Mr. Monson eventually devoted about 1,000 hours of his professional time to the case.[8]  Mr. David Sprowl, an attorney employed by the Monson Firm, devoted about 1,900 hours of his professional time to the case.[9]

Mayer Hoffman filed a motion for summary judgment against Private Asset Group, Inc. and the other plaintiffs in June 2013.  The time commitment required by the Mayer Hoffman case and the related out of pocket costs incurred by the Monson Firm seem to have escalated after this motion was filed.  Mr. Monson approached Mr. Daff and asked if the contingency fee could be boosted from 33 percent to 40 percent.  Mr. Monson felt he needed this increase because of the great burden the Mayer Hoffman litigation was placing on the Monson Firm.[10]  In reference to these burdens, Mr. Monson told Mr. Daff, "I'm dying here."[11]  Although Mr. Monson did not threaten to withdraw from representing the Private Asset Group, Inc. bankruptcy estate, Mr. Monson was of the view that he could not be compelled to work on the case against his wishes in view of the prohibition of involuntary servitude by the Thirteenth Amendment.[12]  Mr. Daff acceded to this request, and a third employment application for the Monson Firm (the "Third Employment Application") incorporating this new term was prepared and filed with the Court on August 1, 2013.  The Court entered an order approving the Third Employment Application on September 3, 2013.

---

[6] 2 R.T. at 83-84.
[7] 1 R.T. at 50, lines 4-5.
[8] This is Mr. Monson's estimate.  He asserts he did not keep actual time records because this was a contingency fee case.  The Court regards this assertion as credible.
[9] Unlike Mr. Monson, Mr. Sprowl kept time sheets documenting his work on the case.  However, these time sheets were later discarded after the case settled.
[10] 2 R.T. at 61-62.
[11] 2 R.T. at 62, line 23.
[12] 2 R.T. at 62, lines 20-23.

Early in 2013 Mayer Hoffman made a settlement offer of $500,000 to the Private Asset Group, Inc. bankruptcy estate.[13] Mr. Monson urged Mr. Daff not to accept the offer because it was too low in view of the case's prospects. This proved to be good advice. After losing the motion for summary judgment against Private Asset Group, Inc. and further settlement negotiations, Mayer Hoffman offered to pay Private Asset Group, Inc.'s bankruptcy estate $2.1 million to settle the case. The Monson Firm filed a motion to approve the compromise on February 26, 2014, which this Court approved on March 21, 2014.

The other 12 or 13 plaintiffs represented by the Zampi Firm did not fare nearly as well as the Private Asset Group, Inc. bankruptcy estate. A number of these plaintiffs dropped out of the case, leaving perhaps 9 remaining plaintiffs who agreed to a settlement with Mayer Hoffman in September 2014.[14] On a per-plaintiff basis, the settlement with the 9 or so remaining plaintiffs was far below the settlement amount received by Private Asset Group, Inc.[15]

Following the inflow of $2.1 million into the bankruptcy estate, funds became available to review proofs of claim that had been filed and to object to such claims when deemed appropriate. The Monson Firm filed an application to be employed to provide additional services of resolving claims filed in the case (the "Fourth Employment Application"). The Fourth Employment Application failed to disclose the loan previously made by Mr. Monson to Mr. Daff. The Court approved the Fourth Employment Application by order entered August 1, 2014. Ultimately, the Monson Firm's work on this segment of the engagement was limited because James Walsh, a creditor in the case and one of the principal shareholders of Private Asset Group, Inc., enlisted the services of the Law Offices of Thomas H. Casey, Inc. A Professional Corporation (the

---

[13] 1 R.T. at 83, lines 9-11.
[14] 3 R.T. at 67, lines 16-25.
[15] The precise amount of the settlement the Zampi Firm gained for its 9 remaining clients is not known. The settlement amount was confidential and subject to a nondisclosure agreement. However, the settlement amount can be very roughly estimated by assuming a 33 percent contingency and grossing up the contingency fees earned by the Zampi Firm to arrive at the settlement amount. 3 R.T. at 68, lines 5-13 (about $1.5 million in combined hourly and contingency fees, of which $900,000 was a contingency fee; this implies a settlement of $2.7 million for 9 plaintiffs). It would therefore appear that the Zampi Firm gained a recovery about $300,000 per plaintiff as compared to the $2.1 million the Monson Firm obtained for Private Asset Group, Inc.'s bankruptcy estate. On this analysis the Monson Firm's recovery per plaintiff was seven times higher than the Zampi Firm's recovery per plaintiff.

"Casey Law Firm") to review and object to claims.[16]  Between June and October 2015, the Casey Law Firm objected to approximately 11 claims.  Thus, from Mr. Daff's standpoint, the bankruptcy estate was receiving the benefit of having the Casey Law Firm review and object to claims at Mr. Walsh's expense.  This was a pivotal development in the case, because later Mr. Daff would employ the Casey Law Firm to object to fees of the Monson Firm and the amended proof of claim of the Zampi Firm.

The Court approved an award of $10,905.36 to the Monson Firm in respect of services rendered pursuant to the Fourth Employment Application.  Earlier, on April 22, 2014, the Court had approved an award of a contingency fee of $840,000 plus reimbursement of costs of $71,234.00 to the Monson Firm for its work in bringing $2.1 million into the estate.

Based upon a letter sent by Gerald B. Determan, Esq. ("Mr. Determan") of the Zampi Firm to Mr. Monson, dated March 4, 2014, it appears Messrs. Monson and Determan had a conversation on that date about the Zampi Firm's Original Zampi POC, filed years earlier, which had asserted a prepetition general unsecured claim in an unknown amount.  Mr. Monson appears to have asked Mr. Determan to submit information supporting a claim for a specific amount.  In a follow up letter dated March 20, 2014, Mr. Determan sent Mr. Monson calculations supporting a claim for pre-bankruptcy services for total attorneys' fees of $91,947.99.  There is no indication in either of these letters that the Zampi Firm was re-thinking its position in the Original Zampi POC that its claim was unsecured.

Sometime between March 2014 and June 2015 – a period that encompasses the Zampi Firm's settlement of the Mayer Hoffman litigation in September 2014 on behalf of the remaining nine plaintiffs, which appears to have been disappointingly low in amount as compared with the $2.1 million amount of the Private Asset Group, Inc. bankruptcy estate settlement -- the Zampi Firm had a radical change in heart as to the amount it was entitled to receive from the bankruptcy estate in respect of the Mayer Hoffman litigation.  On June 15, 2015, the Zampi Firm filed an amended proof of claim

---

[16] 1 R.T. at 105-106.

contending first, that its claim was secured and second, that the amount of the secured claim was $244,648.04.

Less than two months later, on August 5, 2015, the Zampi Firm filed a second amended proof of claim, this time claiming it held a fully-secured claim in the amount of $530,115.50.

Mr. Daff appears to have believed that aggregate contingency fees to all attorneys involved in contingency fee litigation in a bankruptcy case should never exceed 40 percent. Mr. Daff chose to proceed on essentially a concurrent basis against <u>both</u> the Monson Firm and the Zampi Firm. For this purpose, Mr. Daff filed an application to employ the Casey Law Firm on September 25, 2015, which was approved by the Court in an order filed and entered October 21, 2015.

Mr. Daff, using the Casey Law Firm, filed an objection to the Zampi Firm's second amended proof of claim on November 19, 2015. On December 14, 2015, Mr. Daff filed the Motion, seeking disgorgement of the Monson Firm's fees among other forms of relief. The Motion argued that the combined fees of the Monson Firm and the Zampi Firm should not exceed 40 percent of the total recovery of $2.1 million by the bankruptcy estate, that notice of employment applications had been inadequate and that the Court had ample authority to – and should – reconsider the terms of employment and order the disgorgement of fees. Each of these matters subsequently went into mediation. The objection to the Zampi Firm's second amended claim settled, with the Zampi Firm agreeing to accept, and Mr. Daff willing to concede, an allowed secured claim of $195,000.

The dispute between Mr. Daff and the Monson Firm failed to settle through mediation, leading to the re-commencement of litigation. Mr. Monson served interrogatories on Mr. Daff on or about September 13, 2016. Interrogatories 17 and 18 read as follows:

> "17. State the date and amount of each and every loan YOU borrowed from MONSON.
>  18. For each and every loan identified in response to Interrogatory No. 17 above, state the purpose for the loan YOU borrowed from MONSON."

It is a fair assumption that Mr. Monson was oblivious to the highly adverse consequences to himself that he was creating by issuing Interrogatories 17 and 18.[17] Prior to the issuance of these interrogatories, no one seems to have known about the personal loans made by Mr. Monson to Mr. Daff other than Mr. Monson, Mr. Daff and possibly Mr. Sprowl.  The loans had not been disclosed to the Court on any employment application filed by Mr. Daff or Mr. Monson or any other pleading filed prior to September 13, 2016.  At the evidentiary hearing, Mr. Monson testified that he issued Interrogatories 17 and 18 to ensure that he and Mr. Daff were on the same page in terms of the existence and amounts of the two personal loans,[18] but this explanation, while perhaps true in the sense that it was *one* of the purposes of the interrogatories, rings a bit hollow.  The Court believes that the *principal* purpose of Interrogatories 17 and 18 was to throw in Mr. Daff's face that he was being an ingrate by bringing a disgorgement motion against Mr. Monson, that Mr. Monson had been nice to Mr. Daff by making the loans to him and that this was a case of "no good deed goes unpunished."  The Court has considered the possibility that Mr. Monson was trying to get Mr. Daff in trouble with the Court and/or United States Trustee's Office but rejects that analysis for the following reason.  Mr. Monson is an intelligent fellow, and if he had really intended to get Mr. Daff in trouble it likely would have dawned on him that he himself, being on the other side of the loan transaction, would quite possibly be landing himself in a fair amount of trouble as well.

In any event, the revelation of the personal loan transactions quickly led to Mr. Daff's resignation as chapter 7 trustee[19] on October 12, 2016.  Peter J. Mastan ("Mr. Mastan") was appointed as successor chapter 7 trustee for Private Asset Group, Inc. on or about October 18, 2016.  He filed a second supplement to the Motion on December 2, 2016, bringing to the Court's attention the personal loans made by Mr. Monson to Mr. Daff and requesting the Court to order the disgorgement of all of the $922,139.36 paid by the bankruptcy estate to the Monson Firm.  The Court held an evidentiary hearing on the Motion over a three-day period in early October 2017.

---

[17] 1 R.T. at 63-64 ("tear the top off of a Pandora's box", "kicked a hornet's nest").
[18] 1 R.T. at 60, lines 18-22.
[19] 2 R.T. at 79, lines 7-21.

**LEGAL ANALYSIS**

A determination of the Motion requires the Court to analyze whether (1) under the facts of case, is it lawful to order disgorgement, and (2) if it is lawful to order disgorgement, in what <u>amount</u> should disgorgement be ordered?  This is akin to a liability/damages type of analysis.

Mr. Mastan also argues in the Motion that (3) the combined allowed fees to the Monson Firm and the Zampi Firm should be limited to a total of 40 percent of the $2.1 million recovery, with allowed fees to the Monson Firm being reduced by fee amounts allowed to the Zampi Firm, (4) the Court should reconsider the Monson Fee Orders, and (5) the adversary proceeding rules of Federal Rule of Bankruptcy Procedure 7001 *et seq.* should be applied to the extent factual issues remain to be resolved.

Importantly, Mr. Mastan does not argue that the facts and law of this case <u>compel</u> the Court to order a full disgorgement of all fees and costs by the estate paid to the Monson Firm, only that the Court has the discretion to order full disgorgement and should do so.[20]

<u>Is Disgorgement Warranted Under the Facts of This Case?</u>

The Court first considers whether disgorgement can be properly ordered in this case.

11 U.S.C. § 327(a) authorizes a chapter 7 trustee to employ an attorney, but only if such attorney does not hold or represent an interest adverse to the estate and only if such attorney is a disinterested person within the meaning of 11 U.S.C. § 101(14).  The condition that an attorney not hold or represent an interest adverse to the estate and qualify as a disinterested person is a continuing one, and the bankruptcy court is authorized under 11 U.S.C. § 328(c) to deny allowance of compensation for services and reimbursement of expenses to any attorney who at any time during such attorney's employment acquires or represents an interest adverse to the estate with respect to the matter for which such attorney is employed or ceases to qualify as a disinterested person.  Fees for legal services not reasonably likely to benefit the estate may be

---

[20] 3 R.T. at 80, lines 5-15.

reduced under 11 U.S.C. § 330. Federal Rule of Bankruptcy Procedure 2014 requires a trustee who wishes to employ an attorney to file an application with the bankruptcy court. Under Rule 2014, the application must state "any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States Trustee." Further, the application must be accompanied by a verified statement by the person to be employed setting forth such person's connections with the persons and parties described above.

The bankruptcy court must ensure that attorneys who represent the debtor do so in the best interests of the bankruptcy estate and do not have interests adverse to the estate. *Neben & Starrett v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 880 (9th Cir. 1995). Equally true, bankruptcy courts must ensure that attorneys only charge for services that benefit the estate and that such fees and charges are reasonable. 11 U.S.C. § 330(a)(1); *Neben & Starrett v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, *supra,* 63 F.3d at 880. Importantly, a failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the attorney had not actually violated any provision of the Bankruptcy Code or Bankruptcy Rules. *In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252-253 (B.A.P. 9th Cir. 1987).

Here, as in the *Park Helena* case, an attorney's conduct violated Federal Rule of Bankruptcy Procedure 2014(a). Specifically, the Monson Firm failed to disclose all of its connections with a party in interest, namely, Mr. Daff, by failing to timely disclose the two personal loans made by Mr. Monson to Mr. Daff. A professional cannot pick and choose what connections are trivial or irrelevant but must disclose all connections. *Neben & Starrett v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, *supra,* 63 F.3d at 882. There is no right to withhold information because it does not appear to the professional that there is a conflict. *Id.*

Mr. Mastan contends that there has been no proper disclosure of the terms of the Monson Firm's employment. The Court agrees in part with this argument. Undoubtedly, some of the employment applications in this case by the Monson Firm were sloppily prepared, failing to expressly indicate whether employment was being sought under Bankruptcy Code section 327 or 328 and whether the Monson Firm was to be paid on an hourly basis or a contingency basis. Notably, there were service deficiencies with respect to some of the employment applications. The Court regards these deficiencies as grounds for ordering disgorgement under 11 U.S.C. § 330.

Mr. Mastan argues that the Monson Firm failed to disclose that the Zampi Firm had a secured claim for its own fees in this case and that this failure prevented the Court, Mr. Daff and creditors from evaluating whether the Monson Firm's employment was necessary and in the best interest of the estate. However, as late as March 2014 – after a settlement for $2.1 million had already been reached and about the same time as this Court approved the settlement – the Zampi Firm still had given no indication it was asserting a secured claim. The Zampi Original POC asserted only a general unsecured claim in "unknown" amount, and the March 2014 letters from Mr. Determan to Mr. Monson did not specifically assert an entitlement to a secured claim. One of these letters may have had attached to it an unredacted copy of a Zampi Firm prepetition engagement agreement that contained a provision for an attorney's lien.[21] Nevertheless, there was no particular reason in March 2014 for Mr. Monson to believe a secured claim would be asserted, given the Zampi Original POC and the absence of a specific reference to a secured claim in the March 2014 letters. Further, even if there was a reason in March 2014 for Mr. Monson to believe a secured claim would be asserted by the Zampi Firm, it was too late to do anything about it (besides objecting to it): the settlement had already been reached, and the Mayer Hoffman case was over as to Private Asset Group, Inc.

California law requires a written fee agreement in all contingent fee cases. Cal. Bus. & Prof. Code §§ 6147, 6148. Mr. Mastan urges the Court determine there is no

---

[21] 3 R.T. at 16-17.

written fee agreement and, on that basis, to void the agreement between the bankruptcy estate and the Monson Firm.  The Court regards the several employment applications by the Monson Firm in this case, which <u>are</u> in writing, as constituting written fee agreements, subject to court approval.

The Court concludes that the Monson Firm is subject to disgorgement based upon its failure to disclose the existence of the personal loans made by Mr. Monson to Mr. Daff.  The Court further concludes that the sloppy legal work found in some of the employment applications referenced above is also a ground for requiring disgorgement.  Thus, liability for disgorgement is clear in this case.

<u>In What Amount Should Disgorgement Be Ordered?</u>

The Court believes that the amount of the disgorgement in this case hinges on a number of factors and considerations.  The most important of these is whether corrupt influence was intended or occurred.  The presence of actual or intended corrupt influence would lead the Court to order the full disgorgement of all fees and costs received by the Monson Firm.  Another factor is whether the Monson Firm actually knew that disclosure was required and willfully and intentionally failed to disclose.  Other factors are whether the Monson Firm reasonably should have known that disclosure was required, the Court's need to impose sufficiently large penalties in the form of disgorgement to maintain the integrity of the bankruptcy system and the extent to which awarded fees should be reduced through disgorgement to take account of the substandard work performed in connection with the employment applications.

The Court finds no *quid pro quo* with respect to the personal loans made by Mr. Monson to Mr. Daff other than Mr. Daff's undertaking to repay the loans without interest.  Mr. Daff testified that the loans did not influence him in the decisions he made in the case, including decisions relating to the Monson Firm's employment.[22]  The Court finds his testimony entirely credible and true.  Powerful corroborating evidence of this is that Mr. Daff filed a disgorgement motion against the Monson Firm long before anyone knew about the personal loans, other than Mr. Daff, Mr. Monson and possibly Mr. Sprowl.

---

[22] 2 R.T. at 86-87, 88 lines 3-12.

The notion that Mr. Monson was somehow being given a sweetheart deal or improper special consideration and breaks by Mr. Daff because of the personal loans is palpably false. The dealings between Mr. Daff and Mr. Monson during the Private Asset Group, Inc. bankruptcy case were at all times at arm's length.

The Court concludes that Mr. Monson did not know he was supposed to disclose the personal loans to the Court and the other parties in interest (nor of the consequences of nondisclosure) until after he disclosed these loans in the interrogatories served on Mr. Daff in September 2016. If he had known these things, it is highly unlikely, to say the least, that he would have served these interrogatories on Mr. Daff.

Both Mr. Monson and Mr. Daff <u>should have known</u> that the personal loans should have been disclosed. Each is an experienced attorney and each should have known this even before the case commenced or, failing that, should have performed the minimal amount of research necessary to learn basic disclosure requirements applicable to professionals rendering services in bankruptcy cases.

Mr. Monson and Mr. Daff share responsibility for the multiple errors in several of the employment applications, including inadequate service and ambiguities in the hourly rate/contingency fee nature of the engagement (apparently a combination of typographical errors and simple carelessness and neglect). This substandard work justifies some measure of disgorgement.

The negligent failure to disclose the personal loans and the substandard work relating to the employment applications cannot pass without a substantial sanction. Professionals employed in bankruptcy cases must understand the critical importance of a full and complete disclosure under Federal Rule of Bankruptcy Procedure 2014 of all connections between the professional and the debtor, creditors and other parties in interest, including the trustee.

For the reasons stated above, the Court imposes a sanction of Thirty Five Thousand Dollars ($35,000.00) and orders the Monson Firm to pay this amount to Mr.

Mastan in his capacity as chapter 7 trustee within sixty (60) days following the entry of this Memorandum Decision and Order.

## Remaining Arguments of the Trustee

The Court declines to limit the total amount of fees allowable in the aggregate to the Monson Firm and the Zampi Firm to 40 percent. Mr. Mastan has failed to supply the Court with authority that contingency fees paid to attorneys for the bankruptcy estate can never exceed 40 percent. There is ample authority that the intent of Congress in enacting 11 U.S.C. § 330(a) was that professionals and paraprofessionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 330 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6286. Outside of bankruptcy, contingency fees are often 33 percent or, if there is an appeal, 40 percent. On the surface of things, this would suggest that contingency fees in bankruptcy cases should not rise above 40 percent. However, such an approach to the issue radically underprices the risk to attorneys who take on bankruptcy litigation in exchange for a contingency fee, as this very case so vividly illustrates. An attorney taking on a contingency fee case in a bankruptcy proceeding generally has one client: the trustee. The analog outside of bankruptcy is a contingency fee case in which the attorney represents a single plaintiff. Outside of bankruptcy, the single plaintiff may conceivably argue for a return of all or a portion of the attorney's earned contingency fee on a variety of grounds. But inside bankruptcy, the attorney who won the contingency fee may face disgorgement motions from a large number of persons: the trustee; fellow administrative claimholders, in the event the case turns out to be administratively insolvent; the committee of unsecured creditors; holders of priority claims and holders of general unsecured claims, all of whom may stand to gain financially if the attorney's contingency fee is disgorged in whole or in part (assuming the facts are right). To make matters even worse for the contingency fee attorney, adverse parties can under some circumstances use the financial recovery generated by the contingency fee attorney as a war chest to litigate against him and reduce his fee.

And attorneys for the adverse parties may find a rich new source of work for themselves, knowing that they may be able to tap into this financial recovery to get their own fees paid. Yet worse is that fees incurred by an attorney in defending his own fees in a bankruptcy estate cannot be recovered from the bankruptcy estate. *Baker Botts LLP v. ASARCO, LLP*, 135 S. Ct. 2158 (2015). Suffice it to say that all of these additional risks will support a contingency fee above the norms found in contingency fee practice outside of bankruptcy.

    The Court reconsiders the Monson fee orders to the extent necessary to support the disgorgement ordered above.

    The request for application of the adversary proceeding rules is now moot, discovery having been availed of by the parties and evidence having been presented to the Court in an evidentiary hearing over a three day period.

    IT IS SO ORDERED.

###

Date: November 1, 2017

Mark S. Wallace
United States Bankruptcy Judge